```
 1                IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                         AT CHARLESTON


 3
     _____x
 4                                  :
     UNITED STATES OF AMERICA,      :
 5                                  :
                   Plaintiff,       :  NO. 2:18-cr-00261-01
 6                                  :
                     -vs-           :
 7                                  :
     JUANITA CARRIE HAYNES,         :
 8                                  :   JURY TRIAL EXCERPT
                   Defendant.       :
 9   _____x   EDWIN SHAFFER TESTIMONY


10
            TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
11         BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.,
           SENIOR UNITED STATES DISTRICT JUDGE, and a jury
12                      FEBRUARY 27, 2019


13


14   APPEARANCES:
     FOR THE PLAINTIFF:         AUSA J. MATTHEW DAVIS
15                              AUSA MONICA D. COLEMAN
                                Assistant United States Attorneys
16                              U.S. Attorney's Office
                                P.O. Box 1713
17                              Charleston, WV  25326-1713


18


19   FOR THE DEFENDANT:         DAVID O. SCHLES, ESQUIRE
                                815 Quarrier Street
20                              Suite 306
                                Charleston, WV 25301

21


22
              Proceedings recorded by mechanical stenography,
23   transcript produced by computer.
                 _____
24               CATHERINE SCHUTTE-STANT, RDR, CRR,
                    Federal Official Court Reporter
25               300 Virginia Street, East, Room 6009
                      Charleston, WV 25301
```

```
1                            INDEX

2   GOVERNMENT'S
    WITNESSES      DIRECT    CROSS   REDIRECT   RECROSS EXAMINATION
3
    EDWIN SHAFFER    3        31     46,52,56   51,53      ^
4

5

6   DEFENDANT'S
    WITNESSES      DIRECT   CROSS   REDIRECT   RECROSS   EXAMINATION
7
    (None)           ^        ^        ^         ^          ^
8

9

10  GOVERNMENT'S
    EXHIBITS              ADMITTED
11

12  21 -                    6

13

14  DEFENDANT'S
    EXHIBITS              ADMITTED
15
    (None)
16

17

18  Government rests      60

19  Defense rests        66

20

21

22

23

24

25
```

```
 1              P-R-O-C-E-E-D-I-N-G-S
 2              (The following is an excerpt of the jury trial
 3     proceedings held before the Honorable John T. Copenhaver,
 4     Jr., Senior United States District Judge, in the case of the
 5     United States of America vs Juanita Carrie Haynes, on
 6     February 27, 2019, at Charleston, West Virginia.)
 7          Proceedings preceded and followed excerpt but were not
 8     transcribed.)
 9          (Jury in.)
10              MS. COLEMAN:  The United States calls Edwin
11     Shaffer.
12          EDWIN SHAFFER, GOVERNMENT'S WITNESS, SWORN
13              THE CLERK:  Thank you.  You may be seated up
14     there.
15                    DIRECT EXAMINATION
16     BY MS. COLEMAN:
17     Q.   Pull that microphone base a little closer to you and
18     pull it down a little bit.
19          Could you state your name for the record.
20     A.   Edwin Lee Shaffer.
21     Q.   And, Mr. Shaffer, generally, where are you from?
22     A.   3120 Sissonville Drive.
23     Q.   Where did you grow up?
24     A.   Sissonville.
25     Q.   How old are you?
```

SHAFFER - DIRECT

1    A.    39.

2    Q.    How far did you go in school?

3    A.    Ninth grade.

4    Q.    Why did you drop out in the ninth grade?

5    A.    I just didn't like school.

6    Q.    Did you struggle in school?

7    A.    Yeah.

8    Q.    What kind of struggles did you have?

9    A.    Reading and spelling.

10   Q.    Were you in special education classes?

11   A.    All the way through.

12   Q.    Are you currently incarcerated?

13   A.    Yeah.

14   Q.    Is your current incarceration pursuant to federal

15   charges?

16   A.    Yeah.

17   Q.    What are you incarcerated for?

18   A.    Conspiracy and 50 grams or more.

19   Q.    Have you entered a guilty plea in your case?

20   A.    Yeah.

21   Q.    Do you remember, was that pursuant to a written plea

22   agreement with the United States?

23   A.    Yeah.

24   Q.    I'm going to show you what -- on the screen there in

25   front of you -- what's been marked for identification

SHAFFER - DIRECT

1    purposes as Government's Exhibit Number 21.  Do you see it?

2    **A.**    Yeah.

3    **Q.**    Do you recognize that?

4    **A.**    Yeah.

5    **Q.**    How do you recognize it?

6    **A.**    My initials at the bottom.

7    **Q.**    I'm going to turn to the last page of it.  Is that your

8    signature on the bottom of the last page?

9    **A.**    Yeah.

10    **Q.**    Is that the plea agreement you went over with your

11    attorney, Mr. Campbell?

12    **A.**    Yeah.

13    **Q.**    And is that the plea agreement you entered into here

14    before this Court?

15    **A.**    Yeah.

16    **Q.**    Does that plea agreement contain your initials at the

17    bottom of each page?

18    **A.**    Yes.

19    **Q.**    And your signature on the last page?

20    **A.**    Yeah.

21            MS. COLEMAN:  Your Honor, at this time I'd move

22    admission of Government's Exhibit Number 21.

23            MR. SCHLES:  No objection, Your Honor, but I would

24    ask for a limiting instruction.

25            THE COURT:  And tell me what the limit is.

1              MR. SCHLES:  That the plea agreement between Mr.

2      Shaffer and the government has no probative value as to the

3      guilt or innocence of my client.

4              THE COURT:  The jury will so understand, and the

5      Court will be giving you a further instruction as to the

6      role the plea agreement plays in a given case in the course

7      of giving you all of the instructions later on in the case.

8      You may proceed.

9              MS. COLEMAN:  Your Honor, may I publish

10     Government's Exhibit Number 21 to the jury?

11             THE COURT:  You may.

12             Let me ask, you stated there was no objections, as

13     I understand it, Mr. Schles?

14             MR. SCHLES:  No, Your Honor.

15             THE COURT:  And it is admitted.

16             **Government's Exhibit No. 21 admitted.**

17             THE COURT:  And you may publish.

18     BY MS. COLEMAN:

19     **Q.**   I'd like to turn your attention to paragraph 7 on page

20     5 of this plea agreement.  Pursuant to that paragraph of the

21     plea agreement, are you required to cooperate with the

22     United States?

23     **A.**   Yeah.

24     **Q.**   Paragraph 7, entitled "Cooperation."  Right there.

25     Does that include providing trial testimony, if requested,

SHAFFER - DIRECT

1    by the United States, such as your testimony here today?

2    **A.**   Yeah.

3    **Q.**   You can take that down.  Thank you.

4          Have you been sentenced yet?

5    **A.**   No.

6    **Q.**   Mr. Shaffer, prior to your arrest, where did you live?

7    **A.**   3120 Sissonville Drive.

8    **Q.**   Is that in Charleston?

9    **A.**   Yes.

10   **Q.**   I'm going to show you Government's Exhibit 1.

11   **A.**   Yeah.

12   **Q.**   I'm going to wait for it to be put up.

13         Do you recognize that?

14   **A.**   Yeah.

15   **Q.**   What is that?

16   **A.**   That's my house.

17   **Q.**   Who lived there with you?

18   **A.**   My mom.

19   **Q.**   Who is your mom?

20   **A.**   Juanita Carrie Haynes.

21   **Q.**   Do you see your mom here today?

22   **A.**   Yeah.  She's behind you.

23   **Q.**   Where is she seated behind me?

24   **A.**   Straight behind you from here.

25   **Q.**   What she got on?  Can you see anything she's got on?

SHAFFER - DIRECT

1    **A.**    Looks like a white and black -- or white and purple

2    shirt or something.  It's a dark color.

3            MS. COLEMAN:  May the record reflect he's

4    identified the defendant, Your Honor?

5            THE COURT:  Any objection?

6            MR. SCHLES:  No, Your Honor.

7            THE COURT:  The record may so indicate.

8    BY MS. COLEMAN:

9    **Q.**    Did you or the defendant rent or own 3120 Sissonville

10   Drive?

11   **A.**    Rent it.

12   **Q.**    Who rented it?

13   **A.**    I did.

14   **Q.**    When you say you did, was the lease in your name?

15   **A.**    Yeah.

16   **Q.**    Who paid the rent?

17   **A.**    Well, I did and my mom did.  She stayed with me.

18   **Q.**    So was it the case that you both put money towards the

19   rent?

20   **A.**    Yeah.

21   **Q.**    You can take down that exhibit.

22           Which bedroom did your mother stay in?

23   **A.**    The master bedroom.

24   **Q.**    If the lease was in your name, why did your mom stay in

25   the master bedroom?

SHAFFER - DIRECT

1    **A.**    Because she's older.

2    **Q.**    Did anyone else use that bedroom?

3    **A.**    When she wasn't home, I stayed in it.

4    **Q.**    Okay.  How often would your mom not be home?

5    **A.**    She -- she just come there and stayed probably once or

6    twice a week.

7    **Q.**    Come where and stay?

8    **A.**    At the house -- my house.

9    **Q.**    She'd stay at your house once or twice a week, or?

10   **A.**    Yeah.  She -- she -- it was about equal, really.

11   **Q.**    What do you mean equal, really?

12   **A.**    Like, she stay over at my sister's.

13   **Q.**    Whose house did she claim as her residence?

14   **A.**    My house.

15   **Q.**    So she used that house as her permanent residence?

16   **A.**    Because of her mailing address.

17   **Q.**    Did she keep her personal items at your house?

18   **A.**    Her clothing.

19   **Q.**    And why would she go other places, from time to time?

20   **A.**    To take a shower.

21   **Q.**    Why?

22   **A.**    Because we didn't have running water.

23   **Q.**    And then would she always come back to your house?

24   **A.**    Yeah.

25   **Q.**    How would you describe your relationship with your

1    mother?

2    **A.**    Good.

3    **Q.**    Do you have any brothers or sisters?

4    **A.**    I got a sister.

5    **Q.**    So were you the only son?

6    **A.**    Yeah.

7    **Q.**    What did you do for a living?

8    **A.**    I worked on interstates, concrete saw.

9    **Q.**    What about your mother?

10   **A.**    She didn't work.

11   **Q.**    In June of 2018, were you and your mother doing

12   anything else together to earn money?

13   **A.**    Yeah.

14   **Q.**    What were you doing?

15   **A.**    Selling drugs.

16   **Q.**    What kind of drugs?

17   **A.**    Methamphetamine.

18   **Q.**    Were you also using methamphetamine?

19   **A.**    Yeah.

20   **Q.**    Would you consider yourself an addict?

21   **A.**    Yeah.

22   **Q.**    How long had you been using methamphetamine?

23   **A.**    Over 10 years.

24   **Q.**    Did your addiction to methamphetamine control your

25   life?

1    **A.**    Yeah.

2    **Q.**    Was it your addiction to methamphetamine that started

3    you dealing in methamphetamine?

4    **A.**    Yeah.

5    **Q.**    Are you familiar with an individual known as "C"?

6    **A.**    Yeah.

7    **Q.**    Who is "C"?

8    **A.**    He's my supplier.

9    **Q.**    What does C do for a living?

10   **A.**    Sell drugs.

11   **Q.**    What kind of drugs?

12   **A.**    Meth -- methamphetamine.

13   **Q.**    Do you know his real name?

14   **A.**    No.

15   **Q.**    Do you know where he's from?

16   **A.**    Ohio.

17   **Q.**    Do you know what part of Ohio?

18   **A.**    Akron, I think.

19   **Q.**    How do you know C is a drug dealer?

20   **A.**    That's who I got it from.

21   **Q.**    Was he bringing it -- methamphetamine to you in June of

22   2018?

23   **A.**    Yeah.

24   **Q.**    Was he bringing it to anyone else in June of 2018?

25   **A.**    My mom.

SHAFFER - DIRECT

1    **Q.**   And how often was he bringing it to you and your mom?

2    **A.**   Every three or four days.

3    **Q.**   How much was he bringing to you every three or four

4    days?

5    **A.**   Three to five ounces.

6    **Q.**   How much is an ounce of methamphetamine?

7    **A.**   600.

8    **Q.**   What do you mean by 600?

9    **A.**   Ounce, 600 an ounce.

10   **Q.**   $600?

11   **A.**   Yeah.

12   **Q.**   Is that what C charged you for an ounce?

13   **A.**   Yes.

14   **Q.**   How much does an ounce of methamphetamine weigh?

15   **A.**   28 grams.

16   **Q.**   28 grams.  So he's bringing you three to four ounces,

17   is that what you said, or two to three?

18   **A.**   Three, three -- between three and five.

19   **Q.**   So he was bringing between three and five ounces, how

20   often?

21   **A.**   Every three to four days.

22   **Q.**   And charged you $600 an ounce?

23   **A.**   Yeah.

24   **Q.**   And an ounce is 28 grams?

25   **A.**   Yeah.

1    **Q.**    Was C fronting you the meth?

2    **A.**    Sometimes.

3    **Q.**    Or were you paying for it when he brought it?

4    **A.**    Just, if I had the money, I paid him upfront.  And if I

5    didn't, he give it to me and I gave him the money later.

6    **Q.**    What does it mean to front?

7    **A.**    If you don't got the money.

8    **Q.**    If you don't got the money, what?

9    **A.**    He give it to you and you give him the money later.

10   **Q.**    Sort of like a --

11   **A.**    Like a loan.

12   **Q.**    Okay.  So he would give it to you and then expect you

13   to pay him back when you sold it?

14   **A.**    Yeah.

15   **Q.**    Did C know what you were doing and your mom were doing

16   with the drugs?

17   **A.**    Yeah.

18   **Q.**    How do you know that?

19   **A.**    Because we was giving him a bunch of money.

20   **Q.**    When were you arrested?

21   **A.**    July 3rd.

22   **Q.**    Of 2018?

23   **A.**    Yeah.

24   **Q.**    Were you and your mother supplied methamphetamine from

25   C, on or about June 2nd, 2018, through your arrest on July

1    3rd, 2018?

2    **A.**    Yeah.

3    **Q.**    Where did C bring the methamphetamine that he delivered

4    to you and your mother?

5    **A.**    To my house.

6    **Q.**    The house on Sissonville Drive?

7    **A.**    Yes.

8    **Q.**    What did he drive?

9    **A.**    A minivan.

10   **Q.**    Was there anyone with him?

11   **A.**    Sometimes.

12   **Q.**    Did he hand it off to you or to your mother?

13   **A.**    Mostly, me, if I was there.

14   **Q.**    Would he ever hand it off to your mother?

15   **A.**    Yeah, if I wasn't home.

16   **Q.**    Were there times when he dealt with your mother

17   exclusively?

18   **A.**    He has.

19   **Q.**    When?  During that time period, the month of June and

20   July?

21   **A.**    Yeah.

22   **Q.**    When -- can you tell the jury about that?

23   **A.**    If I wasn't home, he handed it to my mom.

24   **Q.**    Was it the case that C just dealt with whoever was

25   there, either you or your mom?

SHAFFER - DIRECT

1   **A.**   If I was there, he dealt with me, mostly.

2   **Q.**   But if you weren't there, would he just deal with your

3   mom?

4   **A.**   Yeah.

5   **Q.**   How would C know to come to deliver drugs to you or

6   your mom?

7   **A.**   He -- if I called him, or sometimes he just stopped in.

8   **Q.**   Would he contact you ahead of time and say he was

9   coming, or would he just show up?

10   **A.**   Sometimes he just showed up.

11   **Q.**   Did C ever give you any other drugs?

12   **A.**   Hu-huh.  No.

13   **Q.**   Where did you and your mother keep the methamphetamine

14   that C delivered?

15   **A.**   In a briefcase safe.

16   **Q.**   Where was that safe located?

17   **A.**   When they come in there, it was in my mom's bedroom.

18   **Q.**   Where did you normally keep it?

19   **A.**   Just between the two bedrooms, carry it back and forth.

20   **Q.**   There was another bedroom in the trailer?

21   **A.**   Yeah.

22   **Q.**   How did the safe unlock?

23   **A.**   It had a digital keypad on it.

24   **Q.**   What kind of sound did it make when it unlocked?

25   **A.**   It clicked when you got to the last number.

SHAFFER - DIRECT

1   **Q.**   Did it make any sound when you were pressing in the

2   numbers?

3   **A.**   Yeah, they beeped.

4   **Q.**   They beeped for each time you pressed?

5   **A.**   Each number beeped.

6   **Q.**   Who had the code to the safe?

7   **A.**   Me and my mom.

8   **Q.**   I'm going to show you what has been entered into

9   evidence as Government's Exhibit 9.

10  **A.**   Yeah, it's on there.

11  **Q.**   I'll wait for the jury to see.

12          Do you see that?  What is that?

13  **A.**   That's the safe.

14  **Q.**   Is that the safe we were just talking about?

15  **A.**   Yeah.

16  **Q.**   And that's the safe that you kept either in the master

17  bedroom or the other bedroom?

18  **A.**   Yeah.

19  **Q.**   What is that (indicating)?

20  **A.**   Scales.

21  **Q.**   Digital scales?

22  **A.**   Yeah.

23  **Q.**   What did you -- who used those?

24  **A.**   Me and my mom.

25  **Q.**   What did you and your mom use those for?

SHAFFER - DIRECT

1    **A.**    Drugs and weigh out stuff.

2    **Q.**    Why would you need to weigh out drugs?

3    **A.**    So you didn't screw yourself.

4    **Q.**    What do you mean by that?

5    **A.**    Cheat yourself.

6    **Q.**    Can you explain, who were you weighing them out for?

7    **A.**    Sell them to customers.

8    **Q.**    So were you weighing out methamphetamine when you would

9    sell the drugs?

10   **A.**    Yeah.

11   **Q.**    And why would you want to do that?

12   **A.**    Well, you wouldn't want to cheat yourself.

13   **Q.**    What do you mean by cheat yourself?

14   **A.**    Give them too much or too less.

15   **Q.**    And based on your experience in the drug business, is

16   that typical for a drug dealer to use digital scales to

17   weigh out their drugs before selling them?

18   **A.**    Yes.

19   **Q.**    Why did you have those in your digital safe?

20   **A.**    To put the methamphetamine in.

21   **Q.**    For who?

22   **A.**    To -- for the customers.

23   **Q.**    You used the sandwich bags to sell the methamphetamine?

24   **A.**    Yes.

25   **Q.**    Who used those sandwich bags?

1    **A.**    Me and my mom.

2    **Q.**    Based on your experience in the drug business, is it

3    typical for a drug dealer to use plastic baggies to

4    distribute their drugs in?

5    **A.**    Yes.

6    **Q.**    Why did you have those scissors?

7    **A.**    To cut the corners.

8    **Q.**    Of what?

9    **A.**    Of the baggies.

10    **Q.**    Who used those scissors?

11    **A.**    Me and my mom.

12    **Q.**    Why would you cut the corners off the baggies?

13    **A.**    Where it wouldn't be so big, the baggie.

14    **Q.**    Why wouldn't you want the baggie to be so big?

15    **A.**    Where if you just put a little bit in it, you didn't

16    need the whole baggie.

17    **Q.**    Are the baggies easier to hide that way?

18    **A.**    Yes.

19    **Q.**    Is that a typical thing, based on your experience in

20    dealing drugs, to cut the corners off the baggies?

21    **A.**    Yes.

22    **Q.**    What's in that cup?

23    **A.**    The cup is just used to put on top of the scales to

24    pour the stuff in to weigh it out.

25    **Q.**    What stuff?

SHAFFER - DIRECT

1    **A.**    The meth.

2    **Q.**    Who used the cup?

3    **A.**    Me and my mom.

4    **Q.**    And what's that money from?

5    **A.**    From selling drugs.

6    **Q.**    Who made that money?

7    **A.**    Me and my mom.

8    **Q.**    What did you and your mother do with the

9    methamphetamine that C delivered to you during the month of

10   June and up to July 3rd, 2018?

11   **A.**    Used it and sold it.

12   **Q.**    Where did the most of those sales take place?

13   **A.**    At 31 -- at the house, at my house.

14   **Q.**    What about your mom, where did most of her sales take

15   place?

16   **A.**    At the house.

17   **Q.**    Did you see her sell out of that residence?

18   **A.**    Yeah.

19   **Q.**    How did you and your mom divide up the money you made

20   from selling methamphetamine?

21   **A.**    We didn't.  We just put it all together.

22   **Q.**    How did you -- what did you do with the money?

23   **A.**    Buy more.

24   **Q.**    Buy more what?

25   **A.**    Meth.

SHAFFER - DIRECT

1    **Q.**   Have you ever -- did you see your mom repay C for

2    methamphetamine that he had fronted you?

3    **A.**   Yeah.

4    **Q.**   How do you know she was repaying him for the fronted

5    meth?

6    **A.**   Because she took the money from the pot, from when we

7    put it together and gave it to him to get more.

8    **Q.**   And when you say from the pot, what are you talking

9    about?

10   **A.**   Well, where we just put it all together.

11   **Q.**   Where you put all the money from the sales together?

12   **A.**   Yeah.

13   **Q.**   Did you have any other suppliers other than C?

14   **A.**   No.

15   **Q.**   So, to your knowledge, did your mother have any

16   suppliers other than C?

17   **A.**   No.

18   **Q.**   I'm going to show you what's been marked -- or I'm

19   going to show you Government's Exhibit 15.  Do you recognize

20   that?

21   **A.**   Yeah.

22   **Q.**   Was that a text message conversation that you were part

23   of?

24   **A.**   Yeah.

25   **Q.**   And that's from your phone?

SHAFFER - DIRECT

1   **A.**   Yeah.

2   **Q.**   That's a person that you received the message from.

3   And the person asks here, "Someone wants a ballgame."

4        What do you understand that to mean?

5   **A.**   Somebody wanting a ball.

6   **Q.**   What's a ball?

7   **A.**   They call it eight-ball.

8   **Q.**   What's an eight-ball?

9   **A.**   Three and a half grams.

10  **Q.**   Of what?

11  **A.**   Meth.

12  **Q.**   And what did you respond?

13  **A.**   I said, "Go to Mom."

14  **Q.**   Why?

15  **A.**   Because I must have been shooting pool or something.

16  **Q.**   So was it common that if you were busy, you would -- or

17  couldn't sell someone, you would send them to your mom?

18  **A.**   Yeah, if I was busy.

19  **Q.**   And was this text exchange -- what date is that?

20  **A.**   June 21.

21  **Q.**   Of 2018?

22  **A.**   Yeah.

23  **Q.**   I'm going to show you Government's Exhibit Number 16.

24  This is an exchange with the same number.  And the person

25  asked, "Hey, you still playing pool?"

SHAFFER - DIRECT

1          And you responded, what?

2     A.   I said, "Yes."

3     Q.   And then here the person said, what?

4          "Your mom didn't answer."

5          And what did you say?

6     A.   I said, "She there."

7     Q.   Again, was it still common for you to refer somebody to

8     your mom?

9     A.   Yeah.

10    Q.   I'm going to now show you Government's Exhibit Number

11    17.  What's the date of this?  Do you see that up here?

12    A.   June 29 -- 29, 2018.

13    Q.   On this date, what's the person asking you for?

14    A.   "U got a ball?"

15    Q.   And what did you respond?

16    A.   I say, "Yea."

17    Q.   Were you in possession of a -- did you take that to

18    mean that you had possession of a ball of methamphetamine?

19    A.   Yeah.

20    Q.   Which is what?  Approximately, how many grams?

21    A.   3.5.

22    Q.   And the person responded, "Be there in 10" minutes.

23    And what was your response?

24    A.   I said, "Ok, mom is home."

25    Q.   Why do you say your mom was home?

SHAFFER - DIRECT

1    **A.**   I must be shooting pool.

2    **Q.**   And so you were referring the person to your mom?

3    **A.**   Yeah.

4    **Q.**   For what purpose?

5    **A.**   To get a ball.

6    **Q.**   And, again, was that common?

7    **A.**   Yes, if I was busy.

8    **Q.**   Did C deliver methamphetamine to you and your mother

9    between June and July 3rd, 2018 --

10   **A.**   Yes.

11   **Q.**   -- in those months?  Do you know how many times?

12   **A.**   No, I couldn't tell you how many -- exactly how many

13   times.

14   **Q.**   On July 3rd of 2018, did officers with the Metro Drug

15   Unit search your residence located at 3120 Sissonville Drive

16   in Charleston?

17   **A.**   Repeat that date.

18   **Q.**   On July 3rd of 2018, did officers search your residence

19   at 3120 Sissonville Drive?

20   **A.**   Yeah.

21   **Q.**   Were you home at the time of the search?

22   **A.**   Yeah.

23   **Q.**   During the search, did officers recover items?

24   **A.**   Yeah.

25   **Q.**   What did they recover?

SHAFFER - DIRECT

```
 1    A.    Methamphetamine.

 2    Q.    Was it a large amount of methamphetamine?

 3    A.    Yeah.

 4    Q.    Was it over 50 grams of methamphetamine?

 5    A.    Yeah.

 6    Q.    Who brought that methamphetamine to your home?

 7    A.    C.

 8    Q.    When did he bring it?

 9    A.    Couple hours before they showed up.

10    Q.    Couple hours before they showed up on July 3rd, 2018?

11    A.    Yeah.

12    Q.    Whose methamphetamine was it?

13    A.    It was mine and Mom's.

14    Q.    What were you and your mom going to do with it?

15    A.    Do it and sell it.

16    Q.    Had C fronted that methamphetamine?

17    A.    Some of it.  I didn't give him all his money; I gave

18    him part of it.

19    Q.    And so you owed him for part of it?

20    A.    Yeah.

21    Q.    Was your mom present at the residence when it was

22    searched?

23    A.    No.

24    Q.    Did you at some point in the day tell the officers

25    where your mom was?
```

SHAFFER - DIRECT

1    **A.**    Yeah.

2    **Q.**    Where did you tell them she was?

3    **A.**    At a motel.

4    **Q.**    Did you tell them which motel?

5    **A.**    Yeah.

6    **Q.**    Which one?

7    **A.**    Cross Lanes.

8    **Q.**    What hotel?

9    **A.**    I think it's Number 8 -- or Number 6.

10   **Q.**    Motel 6?

11   **A.**    Yeah.

12   **Q.**    How did you know she was there?

13   **A.**    'Cause I was there the night before and took a shower

14   and went to shoot pool, and then she went down and stayed

15   all night.

16   **Q.**    You were at the same Motel 6?

17   **A.**    Yeah.

18   **Q.**    So had you been at that same room she was in?

19   **A.**    Yeah.

20   **Q.**    Was it your understanding that your mom was living at

21   that Motel 6?

22   **A.**    No.

23   **Q.**    Was she just staying the night there?

24   **A.**    Yeah, just stayed the night.

25   **Q.**    And you had been there earlier, you said?

1    **A.**    Yeah.

2    **Q.**    And why did you take a shower there?

3    **A.**    To get cleaned up and go shoot pool.

4    **Q.**    And when officers went and found your mom, are you

5    aware if she had money on her?

6    **A.**    Yeah.

7    **Q.**    How do you know that?

8    **A.**    Because I gave her some before she left the house.

9    **Q.**    How come you gave her some?

10   **A.**    I was going to go buy a race car.

11   **Q.**    Where did that money come from -- where did the

12   majority of that money come from?

13   **A.**    Selling drugs.

14   **Q.**    Was it money that you and your mom had taken out of the

15   pot?

16   **A.**    Yeah.  What we made from the sales.

17   **Q.**    And what you referred to earlier as the pot?

18   **A.**    Yeah.

19   **Q.**    Did you also give officers consent to search your cell

20   phone?

21   **A.**    Yeah.

22   **Q.**    What type of cell phone did you have?

23   **A.**    iPhone.

24   **Q.**    Did you have C saved in your cell phone?

25   **A.**    Yeah.

1    **Q.**   I'm going to show you what has been admitted into

2    evidence as Government's Exhibit Number 13, and you've seen

3    this before?

4    **A.**   Yeah.

5    **Q.**   Is -- was this your number at the time?

6    **A.**   Yeah.

7    **Q.**   And was that the number that you used to contact C?

8    **A.**   Yeah.

9    **Q.**   And you had him saved in your phone as C?  Correct?

10   **A.**   Yeah.

11   **Q.**   Did you know him by any other name?

12   **A.**   No.

13   **Q.**   Did you know him by his real name?

14   **A.**   No.

15   **Q.**   And this call log shows a series of missed or -- missed

16   and placed calls between you and C or received calls between

17   you and C.  Did you talk with C on or about July 1?  Do you

18   remember those conversations?

19   **A.**   Yeah, I remember a little bit of it.

20   **Q.**   What do you remember?

21   **A.**   I remember calling him.  He was supposed to call me

22   back.  And then I missed him when he did call back.

23   **Q.**   What were you calling about; do you remember?

24   **A.**   Get some drugs.

25   **Q.**   And do you remember talking to him on the morning that

1    you got arrested?

2    **A.**   Yeah.

3    **Q.**   What were you talking about?

4    **A.**   Drugs.

5    **Q.**   Were you -- what, generally?  Do you remember the

6    specifics?

7    **A.**   No, not exactly.

8    **Q.**   But this number here, was that the number you used to

9    contact C who was your drug dealer?

10   **A.**   Yeah.

11   **Q.**   I'm going to show you what has been admitted as

12   Government's Exhibit Number 18.  Do you recognize this text

13   message exchange?

14   **A.**   Yeah.

15   **Q.**   Who is that exchange with?

16   **A.**   It's with my mom.

17   **Q.**   And can you tell that by what is being said?

18   **A.**   Yeah, by hooking the water up, shutting the bedroom

19   window.

20   **Q.**   And so, was this the number then that you used to call,

21   text or communicate with your mom?

22   **A.**   Yeah.

23   **Q.**   So that's her number?

24   **A.**   Yeah.

25   **Q.**   You didn't have your mom saved in your phone as a

SHAFFER - DIRECT

1    contact?

2    **A.**   No.

3    **Q.**   How is it that you are able to tell that it's your mom

4    then?

5    **A.**   By shutting the bedroom window.

6    **Q.**   You can just tell from the context?

7    **A.**   Yeah.

8    **Q.**   Was (304) 533-3346 your mom's phone number?

9    **A.**   Yes.

10   **Q.**   I'm going to show you -- while I have 18 still on the

11   screen, I want to show you Government's Exhibit Number 14.

12   Can you see both of those?

13   **A.**   Yeah.

14   **Q.**   And can you see the number that you were using to

15   contact your mom on Government's Exhibit Number 18?

16   **A.**   Yeah.

17   **Q.**   And the number over here on top of Government's Exhibit

18   Number 14 for Juanita Haynes?  Do you see those?

19   **A.**   Yes.

20   **Q.**   Are those the same number?

21   **A.**   Yeah.

22   **Q.**   And while we still have Government's Exhibit Number 14

23   on there, I would like to pull up Government's Exhibit

24   Number 13.  And this is your call log summary that we just

25   talked about a minute ago?

1   **A.**   Yeah.

2   **Q.**   And you had C saved as 304-382-1638; is that correct?

3   **A.**   Yeah.

4   **Q.**   And is that the same number that is on, first, your

5   mom's call log, Government's Exhibit Number 14, as C,

6   382-1638?

7   **A.**   Yeah.

8   **Q.**   It may be easier to show that example by pulling up

9   Government's Exhibit Number 20, and leaving Government's

10   Exhibit Number 13 up.

11         So this is a phone contact, Exhibit 20.  Is that your

12   phone number, Edwin, 304-543-4193?

13   **A.**   Yeah.

14   **Q.**   And is 304-382-1638 the same number that you used to

15   contact C from Government's Exhibit Number 13?

16   **A.**   Yeah.  Yeah.

17   **Q.**   So those are the same individual, that C, and the C

18   that you were contacting are the same number?

19   **A.**   Yeah.

20   **Q.**   And every time that you contacted the number that you

21   have for 304-382-1638 for C, was the person who responded or

22   answered the person you knew to be the drug dealer who

23   supplied you and your mom with methamphetamine?

24   **A.**   Yeah.

25   **Q.**   Did anybody else ever respond on that phone?

SHAFFER - CROSS

1    **A.**   No.

2    **Q.**   Did anybody else ever answer that phone?

3    **A.**   No.

4    **Q.**   Was the only person who ever answered that phone,

5    responded to your calls, the person who you knew to be your

6    source of supply?

7    **A.**   Repeat that.

8    **Q.**   Was the person who ever -- whenever you called

9    304-382-1638, the number you have saved for C, was the

10   person who answered the person who was supplying you and

11   your mom with methamphetamine?

12   **A.**   Yeah.

13   **Q.**   Did anyone else ever answer that phone?

14   **A.**   No.

15   **Q.**   Did anyone else ever call you from that phone?

16   **A.**   No.

17        MS. COLEMAN:  May I have just a minute, Your

18   Honor?

19        THE COURT:  Yes, ma'am.

20        MS. COLEMAN:  I don't have any further questions,

21   Your Honor.

22                    **CROSS-EXAMINATION**

23   **BY MR. SCHLES:**

24   **Q.**   Good afternoon.  I'm David Schles.  I'm your mother's

25   lawyer.  And I'm going to ask you some questions now.  I

SHAFFER - CROSS

1    want to --

2              MR. SCHLES:  Could you put Number 18 back up,

3    please?

4    BY MR. SCHLES:

5    Q.   Do you see that in front of you?

6    A.   Yeah.

7    Q.   You earlier identified that as a text string or

8    exchange with your mother, correct?

9    A.   Yeah.

10   Q.   That has nothing to do with drugs, does it?

11   A.   No.

12   Q.   And this was taken -- I believe, extracted from your

13   phone?

14   A.   Yeah.

15   Q.   And your texts -- you had hundreds of texts in your

16   iPhone, did you not?

17   A.   Yeah.

18   Q.   And you didn't delete them?

19   A.   Hu-huh.

20   Q.   So all of the texts that you had made using that iPhone

21   were in your phone at the time that you gave the police

22   permission to search your phone on July 3rd, 2018, correct?

23   A.   Yeah.

24   Q.   And so they have all your texts?

25   A.   Yeah.

SHAFFER - CROSS

1   **Q.**   And this is the texts that they chose to show between

2   you and your mom, which looks to be about a problem with the

3   water and getting food, just normal family stuff, correct?

4   **A.**   Right.

5   **Q.**   You stated that C --

6        MR. SCHLES:  Could you put up Number 13, please?

7   BY MR. SCHLES:

8   **Q.**   You stated that C always answered the phone.  That's

9   when he answered it, correct?

10  **A.**   Right.

11  **Q.**   But he didn't always answer the phone, did he?

12  **A.**   Not every time.

13  **Q.**   There were missing calls, correct?

14  **A.**   Correct.

15  **Q.**   And do you see the log in front of you there?

16  **A.**   Yeah.

17  **Q.**   That shows two calls coming in from 304-382-1638,

18  correct?

19  **A.**   Yes.

20  **Q.**   It's not really clear to me what missed, whether the

21  miss is incoming or outgoing.  But there are no calls from

22  you to C on this exhibit, are there?

23  **A.**   No.

24        MR. SCHLES:  And could you put up Government's

25  Exhibit Number 14, please?  Thank you.

1    BY MR. SCHLES:

2    **Q.**   These calls are not calls you were involved with at

3    all?  Let me -- these are calls from your mother's phone,

4    correct?  Either to or from your mother's phone, correct?

5    **A.**   Yeah.

6    **Q.**   You don't remember being present, either in the

7    presence of your mother or in the presence of C, when any of

8    these calls were made, do you?

9    **A.**   Hu-huh.

10   **Q.**   So you have no idea what was discussed, do you?

11   **A.**   No.

12           MR. SCHLES:  Could you put up Government's Exhibit

13   Number 15, please?  Thank you.

14   BY MR. SCHLES:

15   **Q.**   Do you see that on your screen?

16   **A.**   Yeah.

17   **Q.**   Who is Sonjay?

18   **A.**   Must have been Sonya, a girl named Sonya.

19   **Q.**   You don't know who Sonjay is, do you?

20   **A.**   Hu-huh.

21   **Q.**   The number doesn't ring a bell; the name doesn't ring a

22   bell?

23   **A.**   Hu-huh.  No.

24   **Q.**   And if I'm understanding this correct, the first text

25   you received, "Do U have anything like I got the other day

SHAFFER - CROSS

1     with you?"

2          And it's your belief, based just on your experience,

3     not your actual recollection, that this person is talking

4     about drugs?

5     **A.**   Not at first.

6     **Q.**   They are not talking about drugs?

7     **A.**   No.

8     **Q.**   What are they talking about?

9     **A.**   A ball game.

10    **Q.**   What ball game?

11    **A.**   I figure it was about baseball.

12    **Q.**   So when you first got the text, you didn't know what

13    they were talking about when they said, "ball game"?

14    **A.**   When they said, "Do U have anything like I got?"

15         And I said, "No."

16    **Q.**   And you said, "Go to mom"?

17    **A.**   Yeah.

18    **Q.**   You didn't call your mother, though, did you?

19    **A.**   Hu-huh.

20    **Q.**   You didn't get a call from your mother, did you?

21    **A.**   No.

22    **Q.**   You don't know if this person named Sonjay did go to

23    your mother, do you?

24    **A.**   I don't know for sure, no.

25    **Q.**   So all you know is that you got a text from someone you

1    can't identify, and you said, "Go to mom"?

2    **A.**    Yeah.

3    **Q.**    Did your mom have any idea that you said that?

4    **A.**    No.

5              MR. SCHLES:  Would you put up 16, please?

6    BY MR. SCHLES:

7    **Q.**    Another call from Sonjay, who we can't identify, asks

8    whether you are playing pool.

9          You say, "Yes."

10         "When will U be done?"

11         "IDK," means I don't know?

12   **A.**    Yeah.

13   **Q.**    She says, "Your mom didn't answer."

14         So Sonjay, we can presume, did not talk to your mom,

15   correct?

16   **A.**    Yeah.

17   **Q.**    You said, "She there"?

18   **A.**    Yeah.

19   **Q.**    She said -- and we are assuming Sonjay, we don't really

20   know that -- "I don't have a car and I'm afraid to ride with

21   people."

22         You said, "Ok."

23         She says, "Okay what lol," which means laughing out

24   loud?

25   **A.**    Yeah.

1    **Q.**   You responded again, "IDK."

2    **A.**   Yeah.

3    **Q.**   And she asks you, "Will U meet me or come to the

4    house?"

5         And you said:  "I can't right now"?

6    **A.**   Yeah.

7    **Q.**   So there is no referral to your mother in this, is

8    there?

9    **A.**   No.

10   **Q.**   And you have no reason to believe, based on this, that

11   anyone went to your mother based on this, do you?

12   **A.**   No.

13        MR. SCHLES:  Could you put up 17, please?

14   BY MR. SCHLES:

15   **Q.**   Also, again, Sonjay, the unidentified person, asking

16   whether -- "U home?"

17        You answer, "What's up?"

18        Person asks, "U got a ball?"

19        Which you took to mean somebody wanted to know whether

20   you had an eight-ball of methamphetamine?

21   **A.**   Yeah.

22   **Q.**   And you said, "Yeah."

23   **A.**   Yeah.

24   **Q.**   Meaning you had one?

25   **A.**   Yeah.

SHAFFER - CROSS

1    **Q.**   And you said in response to, "U got a ball?"

2         "Yeah, I do"?

3    **A.**   Yeah.

4    **Q.**   This person then said, "Be there in 10"?

5    **A.**   Yeah.

6    **Q.**   And you responded, "Ok mom home"?

7    **A.**   Yeah.

8    **Q.**   But that doesn't mean that your mother sold that person

9    an eight-ball, does it?

10   **A.**   No.

11   **Q.**   It just said your mother is home, but you said you were

12   the person with the eight-ball, correct?

13   **A.**   Yeah.

14   **Q.**   And that person said, "Kk," which I assume is slang for

15   okay?

16   **A.**   Yeah.

17   **Q.**   Do you recall whether that transaction ever even took

18   place with you?

19   **A.**   Yeah.

20   **Q.**   Did you sell a person an eight-ball on Friday, June

21   29th?

22   **A.**   I can't remember if I did or not.

23   **Q.**   That's what I asked.  You don't remember whether this

24   transaction ever took place?

25   **A.**   No.

SHAFFER - CROSS

1   **Q.**   You have a text message with this person that your

2   mother was not involved in?

3   **A.**   Yeah.

4   **Q.**   And you're not sure whether any transaction resulted or

5   not, are you?

6   **A.**   No.

7   **Q.**   I'm looking now at your plea agreement.

8        Could you put up paragraph -- I believe it's 8, from

9   Government's Exhibit Number 21.

10        You've already identified that you recognize this as

11   the plea agreement you signed with the United States?

12   Correct?

13   **A.**   Correct.  Yes.

14   **Q.**   Do you read well?

15   **A.**   No, I can't read.

16   **Q.**   Do you remember someone explaining to you what the use

17   immunity clause means?

18   **A.**   I don't remember what it means.

19   **Q.**   Did somebody explain to you that, while you're

20   cooperating with the feds, that nothing you say can be used

21   against you?  Do you remember being told that?

22   **A.**   Yeah.

23   **Q.**   Do you remember being told that all you can do from

24   this point on is help yourself?

25   **A.**   No.

SHAFFER - CROSS

1    **Q.**    Nobody told you that cooperating with the government

2    might get you a lighter sentence?

3    **A.**    No.

4    **Q.**    Nobody told you that you could get a benefit to

5    yourself from cooperating with the government?

6    **A.**    Hu-huh.  No.

7    **Q.**    And I don't want to get into what your lawyer told you,

8    but you're cooperating just solely because you want to

9    testify against your mother?

10   **A.**    No.  I just -- it ain't going to help me or her none,

11   either.  That's what I figured.

12   **Q.**    So you are not hoping that your cooperating with the

13   government will result in a better outcome for you?

14   **A.**    No.

15   **Q.**    Then why are you doing it?

16   **A.**    I don't know.

17   **Q.**    Well, you are in court testifying against your mother.

18   I mean, you must expect something is going happen?

19           MS. COLEMAN:  Objection, Your Honor; asked and

20   answered.

21           THE COURT:  Pardon?

22           MS. COLEMAN:  Asked and answered.  He's answered

23   his question.

24           THE COURT:  You may inquire.

25   BY MR. SCHLES:

*Catherine Schutte-Stant, RDR, CRR (304) 347-3151*

1    **Q.**   You are in court here today testifying against your

2    mother, you must expect something is going to come from

3    this?  Don't you?

4    **A.**   No.  I hope it does, but --

5    **Q.**   Yes, you don't know.  Nobody -- I understand, nobody

6    has made you any specific promise, but you are hoping this

7    helps you, aren't you?

8    **A.**   Yeah.

9    **Q.**   Okay.

10          MR. SCHLES:  And could you put up, it's the top of

11   Page 7, the part of paragraph 11 that is on page --

12          PARALEGAL:  What exhibit, sir?

13          MR. SCHLES:  Page 7.  Yes.

14   BY MR. SCHLES:

15   **Q.**   Do you see that, where it says that the parties have

16   agreed that your Base Offense Level will be Base Offense

17   Level 26?

18   **A.**   Yeah.

19   **Q.**   And did your lawyer or someone from the government

20   explain to you what that means under the sentencing

21   guidelines?

22   **A.**   Yeah.

23   **Q.**   And are you aware that a Base Offense Level of 26 under

24   the sentencing guidelines corresponds to 200 to 350 grams of

25   a mixture containing methamphetamine?

SHAFFER - CROSS

1   **A.**   Yeah.

2   **Q.**   And you have testified today that you received -- how

3   many ounces did you say you typically received from C at a

4   time?

5   **A.**   Three to five.

6   **Q.**   And three would be about 85 grams?

7   **A.**   Yep.

8   **Q.**   And five would be about 140 grams?

9   **A.**   Yeah.

10  **Q.**   And you testified that this occurred multiple times,

11  correct?

12  **A.**   Yeah.

13  **Q.**   So your testimony is that you received more than 350

14  grams of methamphetamine, correct?

15  **A.**   Yeah, 200 grams or more.

16  **Q.**   200 to 350?

17  **A.**   Yeah.

18  **Q.**   But, in fact, you received more than 350 grams from C,

19  according to your own testimony, correct?

20  **A.**   Yeah.

21  **Q.**   But the government was nice enough to agree to

22  recommend that you be sentenced as if you received 350 down

23  to 200, correct?

24  **A.**   Yeah.

25  **Q.**   And that's also a benefit for you from this plea

SHAFFER - CROSS

```
 1    agreement, isn't it?
 2    A.    Yeah.
 3    Q.    You stated that you began using methamphetamine
 4    approximately 10 years ago?
 5    A.    Longer than 10 years ago.
 6    Q.    Longer than 10 years ago?
 7    A.    10 or longer.
 8    Q.    And you -- you used primarily methamphetamine that
 9    whole time?
10    A.    Yeah.
11    Q.    Did you ever use any other drugs?
12    A.    No.
13    Q.    You just like meth?
14    A.    Yeah.
15    Q.    And I'm going to assume -- well, I shouldn't assume.
16          You didn't begin by using large quantities of
17    methamphetamine when you first started using meth, did you?
18    A.    No.
19    Q.    Gradually, over time, you became a very, very heavy
20    user, didn't you?
21    A.    Yes.
22    Q.    Looking back to -- and let's just say generally the
23    summer of 2018, June through July, the day you were
24    arrested, you were using methamphetamine extremely heavily
25    during that period, weren't you?
```

1    **A.**    Yeah.

2    **Q.**    Were you pretty much high all the time you were awake?

3    **A.**    Yeah.

4    **Q.**    And meth keeps you awake, too, doesn't it?

5    **A.**    Yeah.

6    **Q.**    So you were doing a lot of methamphetamine.  Could you

7    estimate how much methamphetamine you would use in a

8    typical, average day during that period of time?

9    **A.**    Myself, I probably used a ball myself.

10   **Q.**    Three and a half grams a day?

11   **A.**    Yeah.

12   **Q.**    How did you do it?

13   **A.**    Snort it.

14   **Q.**    You snorted three and a half grams a day?  Pretty bad

15   on your nose, isn't it?

16   **A.**    Well, made it like leather by the time I got done.

17   **Q.**    And would you agree with me that abusing

18   methamphetamine to that extent can make it difficult for you

19   to accurately understand what's going on around you because

20   you're stoned out of your mind?

21   **A.**    Not all the time.

22   **Q.**    Not all the time.  But some of the time?

23   **A.**    Yeah.

24   **Q.**    And does doing drugs to that extreme affect your

25   ability now to remember things that happened back when you

```
1    were doing drugs so heavily?  You're not doing it now, are

2    you?

3    A.    No, I ain't doing it now.

4    Q.    You are in jail now?

5    A.    Clean now.

6    Q.    So you are as sober for as long a period as you've been

7    in quite a while?

8    A.    Yeah.

9    Q.    But you do have difficulty remembering things from back

10   when you were doing an eight-ball a day, don't you?

11   A.    Yeah.

12   Q.    So you wouldn't ask this jury to rely on your memory

13   for anything important, would you?

14          MS. COLEMAN:  Objection, Your Honor.

15          THE WITNESS:  Hu-huh.

16          THE COURT:  Just a moment.  You want to respond to

17   that?

18       Mr. Schles, you want to respond to the objection?

19          MR. SCHLES:  Your Honor, I'm simply asking him

20   whether, in his opinion, his memory is strong enough that

21   other people should rely on it.

22          MS. COLEMAN:  Your Honor, I think that he's being

23   argumentative and that calls for this witness to speculate

24   as to what other people should believe and not believe.  And

25   I think that's an inappropriate question.
```

1          THE COURT:  The objection is overruled.  You may

2     continue.

3     BY MR. SCHLES:

4     **Q.**   Do you remember my question?

5          THE COURT:  Restate the question.

6     BY MR. SCHLES:

7     **Q.**   Mr. Shaffer, would you agree that your memory of the

8     events that occurred when you were heavily abusing

9     methamphetamine is unreliable enough that other people

10    should not rely on your memory?

11    **A.**   No.

12    **Q.**   They should not rely on it, should they?

13    **A.**   Hu-huh.

14         MR. SCHLES:  I have no further questions, Your

15    Honor.

16                    **REDIRECT EXAMINATION**

17    **BY MS. COLEMAN:**

18    **Q.**   Mr. Shaffer, is your memory good enough to remember

19    whether or not you and your mother were distributing

20    methamphetamine together?

21    **A.**   Yeah.

22    **Q.**   Were you and your mother distributing methamphetamine

23    together from June of 2018 until your arrest in July of

24    2018?

25    **A.**   Yeah.

SHAFFER - REDIRECT

1   **Q.**   Is your memory good enough on that subject that people

2   should rely on your memory for that?

3   **A.**   Yeah, that part that I know.   That I can remember that

4   part.

5   **Q.**   How is it that you can remember that part?

6   **A.**   That's how we got more, when we sold it.

7   **Q.**   Is that how you supported your habit?

8   **A.**   Yeah.

9   **Q.**   How is it that you can remember that your mother was

10  involved with you in that?

11  **A.**   I don't.

12  **Q.**   You don't remember whether --

13  **A.**   I mean, I do remember her involved in it with that.

14  **Q.**   How is it that you remember that?

15  **A.**   Because I was there with her.

16  **Q.**   How is it that people -- you can remember who your

17  source of supply was?

18  **A.**   Because that's the only person I got it from.

19  **Q.**   How is it that you can remember that your mother and

20  you were dealing with your source of supply?

21  **A.**   Because we done it together.

22  **Q.**   Is your memory such that you can remember your mother

23  and you paying your source of supply?

24  **A.**   Repeat that.

25  **Q.**   Is your memory such that you can remember your mother

SHAFFER - REDIRECT

1    and you paying your source of supply?

2    **A.**   Yeah, we paid it together.

3    **Q.**   Do you remember -- do you remember the source coming to

4    your house and bringing ounces of methamphetamine?

5    **A.**   Yeah.

6    **Q.**   Do you remember your mother being present for that?

7    **A.**   Yeah.

8    **Q.**   Do you remember selling methamphetamine?

9    **A.**   Yeah.

10    **Q.**   Do you remember your mother selling methamphetamine?

11    **A.**   Yeah.

12    **Q.**   Do you remember repaying C for the methamphetamine?

13    **A.**   Yeah.

14    **Q.**   Do you believe your memory of those -- of those events

15    are such that people should rely on them?

16    **A.**   What is it again?

17    **Q.**   Do you believe that your memory of those events, the

18    distribution of methamphetamine from your home, your

19    mother's involvement in that distribution --

20          THE COURT:  I'm going to ask you to start your

21    question again and put dates on it.

22    BY MS. COLEMAN:

23    **Q.**   Do you believe that your memory of the distribution of

24    methamphetamine from your home from June of 2018 until your

25    arrest of July of 2018 --

1            MR. SCHLES:  Objection; asked and answered, Your

2     Honor.

3            THE COURT:  Overruled.

4     BY MS COLEMAN:

5     **Q.**   -- is such that people should rely on it?

6     **A.**   Yeah.

7     **Q.**   Do you believe that your memory of your mother's

8     involvement with you in that distribution of methamphetamine

9     from June of 2018 until July 3rd of 2018 is such that people

10    should rely on it?

11    **A.**   Yeah.

12    **Q.**   And do you believe that your memory of C's involvement

13    in that distribution from June 2018 until July 3rd of 2018

14    is good enough that people should rely on it?

15    **A.**   Yeah.

16    **Q.**   I want to turn your attention to Government's Exhibit

17    -- it's 19, your plea agreement.

18            MR. SCHLES:  Could you show me what you are

19    planning on showing him, please?

20            MS. COLEMAN:  Paragraph 9.

21    BY MS. COLEMAN:

22    **Q.**   I want to turn your attention to paragraph 9.  That

23    paragraph is titled "Limitations on Immunity."  On

24    cross-examination, you were asked about the use immunity

25    provision of your plea agreement.

SHAFFER - REDIRECT

1    Did your attorney go over with you the limitations on

2    that immunity, paragraph 9?

3  **A.**   Yeah.

4  **Q.**   And did he explain to you what would happen if you took

5    the stand and lied?

6  **A.**   Yeah, it hurts you.

7  **Q.**   How did he explain to you it hurts you?

8  **A.**   He said, tell nothing but the truth.

9  **Q.**   Did he explain to you that under this provision of your

10   plea agreement, the United States has reserved the right to

11   prosecute you for perjury or false swearing if you testify

12   falsely?

13 **A.**   Yeah.

14 **Q.**   Go to the next, the top part of the next page.

15   Your attorney explain that to you?

16 **A.**   Yeah.

17 **Q.**   And that if you did that, the United States also has

18   the right to void your plea agreement?

19 **A.**   Yeah.

20 **Q.**   Was that explained to you by your attorney?

21 **A.**   He explained all of it to me, but I don't remember it.

22 **Q.**   Do you remember him explaining that if you testified

23   falsely, the United States could void your plea agreement?

24 **A.**   Yeah -- or, no.

25 **Q.**   You don't remember that?

SHAFFER - RECROSS

1    **A.**    No.

2    **Q.**    Do you remember being told that if you testified

3    falsely, you could be prosecuted for perjury?

4    **A.**    I don't remember it.

5    **Q.**    What you remember your attorney telling you was that --

6    or what you remember being told is that it was bad if you

7    get up here and testify falsely?

8    **A.**    Yeah.  I said I'd tell nothing but the truth.

9         MS. COLEMAN:  Just a minute, Your Honor.

10        (Pause.)

11        MS. COLEMAN:  I don't have any further questions,

12   Your Honor.

13                     **RECROSS-EXAMINATION**

14   **BY MR. SCHLES:**

15   **Q.**    Mr. Shaffer, when your lawyer explained to you that,

16   quote, "You'd get in trouble if you didn't tell the truth,"

17   did he explain to you who determines whether or not you

18   would be charged with not telling the truth?

19   **A.**    He just, I think he said -- I said -- I told him I just

20   tell nothing but the truth.

21   **Q.**    Well, do you believe that your mother or me as your

22   mother's attorney can prosecute you for perjury, or is it

23   the federal government that would do it?

24   **A.**    Federal government.

25   **Q.**    So it's important that you say what they believe is

1    true, correct?

2    **A.**   No.

3            MS. COLEMAN:  Objection, Your Honor.

4            THE WITNESS:  I don't understand --

5            THE COURT:  Just a moment.

6            MS. COLEMAN:  I think this witness had testified

7    that he doesn't know anything about being charged for

8    perjury or false swearing.

9        His testimony was that his attorney just told him just

10   to tell the truth.

11           THE COURT:  Thank you.  You may continue.

12   BY MR. SCHLES:

13   **Q.**   You don't have to worry about your mother doing

14   anything to you if she doesn't like what you testify to

15   today, do you?

16   **A.**   No.

17   **Q.**   The power of the law is with the government, not with

18   your mother, correct?

19   **A.**   Right.

20   **Q.**   And right now, it's the law you are afraid of, correct?

21   **A.**   Yeah.

22           MR. SCHLES:  No further questions.

23                        **REDIRECT EXAMINATION**

24   **BY MS. COLEMAN:**

25   **Q.**   Mr. Shaffer, did the government ever tell you what to

1    say?

2    **A.**    No.

3    **Q.**    What did the government tell you to say?

4    **A.**    They didn't tell -- tell me to say nothing.  I was -- I

5    said I would say nothing but the truth when they asked me

6    something.

7    **Q.**    Did you -- what did your attorney tell you to say?

8    **A.**    Nothing.

9    **Q.**    Did anybody tell you how to testify here today?

10   **A.**    No.

11   **Q.**    Did anybody make any threats to you?

12   **A.**    No.

13          MS. COLEMAN:  No further questions, Your Honor.

14          THE COURT:  Anything further, Mr. Schles?

15          MR. SCHLES:  Yes, Your Honor.

16                    **RECROSS-EXAMINATION**

17   **BY MR. SCHLES:**

18   **Q.**    Did you ever meet with me prior to your testimony

19   today?

20   **A.**    No.  Today is the only time I seen you.

21   **Q.**    Did you ever meet with anyone sitting at that table

22   prior to your testimony today?

23   **A.**    I met with them.

24   **Q.**    How many times?

25   **A.**    One of them, two, and another one, three -- four.

1    **Q.**   On one occasion, which I believe would have been

2    probably early this month, February 6 or February 7, you met

3    with Mr. Davis and perhaps also with Detective Aldridge at

4    South Central Regional Jail?

5    **A.**   Yeah.

6    **Q.**   On that occasion, did you not tell them that the money

7    from the Motel 6 from your mom, my client, at the Motel 6,

8    on July 3rd came from a job that you had in Virginia?

9    **A.**   Yeah.

10   **Q.**   You told them that, didn't you?

11   **A.**   Yeah.

12   **Q.**   But that's not what you testified here earlier today,

13   is it?

14   **A.**   I told them some of the money; I didn't say all of it.

15   **Q.**   Well, did they have more discussions with you about the

16   money after you told them that it came from a job?

17   **A.**   No.

18   **Q.**   You didn't meet with them again after that?

19   **A.**   Yeah.

20   **Q.**   You did meet with them again after that, didn't you?

21   **A.**   Mm-hmm.

22   **Q.**   And you talked more about the money, didn't you?

23   **A.**   Yeah.  I just said -- we -- the biggest part of the

24   money come from the drugs.

25   **Q.**   So, in other words, after meeting with them, you

1    changed your testimony to say that part of the money came

2    from drugs, and only part of the money came from a job

3    where, on one occasion, you told them that the money came

4    from a job you had in Virginia, I think, pouring concrete or

5    something like that, correct?

6    **A.**    Concrete job.

7              MS. COLEMAN:  Objection, Your Honor.  That's not

8    what he said.

9              THE COURT:  Ask him whether that is true or not.

10   BY MR. SCHLES:

11   **Q.**   Is it true that -- as I say, I believe it was February

12   6, possibly February 7, of -- earlier this month, in 2019,

13   you met with the government employees and you told them that

14   the money that my client had on July 3rd, came from a job

15   you had in Virginia, correct?

16   **A.**    Yeah.

17   **Q.**   That's what you told them?

18   **A.**    Yeah.

19   **Q.**   After you told them that, though, there was another

20   meeting and they asked you more about that, didn't they?

21   **A.**    Yeah.

22   **Q.**   And now your testimony is that only some of the money

23   came from the job in Virginia, correct?

24   **A.**    Yeah.

25   **Q.**   And today, when you testified, you didn't even mention

1    the job in Virginia, did you?

2    **A.**    No.   I said a job.

3          MR. SCHLES:   I have no further questions.

4                    **REDIRECT EXAMINATION**

5    **BY MS. COLEMAN:**

6    **Q.**    Mr. Shaffer, when you met with the government to

7    prepare for your testimony here today, did any of the

8    government tell you what to say?

9    **A.**    No.

10   **Q.**    What did the government tell you to say?

11   **A.**    Tell nothing but the truth.

12   **Q.**    And as far as that money goes, was part of that money

13   from your job?

14   **A.**    Part of it was.

15   **Q.**    And was part of that money drug distribution money?

16   **A.**    Yeah.

17   **Q.**    Was the majority of it drug distribution money?

18   **A.**    Yeah.   What I can't remember -- I can't remember -- my

19   mind was -- where I was high.

20   **Q.**    And where the money came from, or how much of the money

21   was drug distribution money and how much was your job, one

22   of the small memory -- one of those details that you just

23   can't remember fully?

24   **A.**    Yeah.

25   **Q.**    But are you sure that part of it was drug distribution

SHAFFER - REDIRECT

1    and part of it was from your job?

2    **A.**    Yeah.

3              MS. COLEMAN:  That's all the questions I have,

4    Your Honor.

5              MR. SCHLES:  I have no further questions, Your

6    Honor.

7              THE COURT:  Thank you.

8         And may Mr. Shaffer be excused from the trial?

9              MS. COLEMAN:  Yes, Your Honor.

10             THE COURT:  Mr. Schles, may the witness be excused

11   from the trial?

12             MR. SCHLES:  Yes, Your Honor.

13             THE COURT:  Thank you.

14        Mr. Shaffer, let me mention to you before you leave,

15   that you are not to discuss your testimony with any other

16   witness in this case until the trial is over, unless the

17   Court gives you permission otherwise.

18             THE WITNESS:  All right.

19             THE COURT:  Thank you, sir.

20             THE WITNESS:  Thank you.

21             MS. COLEMAN:  Your Honor, with that, the United

22   States rests -- but before we rest, we would like to ask the

23   Court to take judicial notice that methamphetamine is a

24   Schedule II controlled substance, and that Charleston,

25   Kanawha County, West Virginia, is within the Southern

1    District of West Virginia.

2              THE COURT:  Any objection?

3              MR. SCHLES:  No, Your Honor.

4              THE COURT:  The Court will take judicial notice

5    accordingly.

6              MS. COLEMAN:  And with that, the United States

7    would like to confirm admission of its exhibits.

8              THE COURT:  Well, check it out right now with Ms.

9    Miller, if you would.

10             MS. COLEMAN:  Yes, Your Honor.  You want me to

11   approach?

12         (Pause.)

13             THE COURT:  Mr. Schles, before you leave, were 16

14   and 17 moved for admission, and were they admitted?

15             MS. COLEMAN:  They were all moved.  They were all

16   moved under Sergeant Higginbotham, and admitted under

17   Sergeant Higginbotham.  We just published them through

18   Shaffer.

19             MR. SCHLES:  Yes, with my objection.

20             THE COURT:  Are they deemed admitted?

21             MS. COLEMAN:  Yes, they were admitted, Your Honor.

22             MR. SCHLES:  Your Honor, I objected at the time

23   they were admitted on the grounds previously discussed.

24             THE COURT:  Very good.  Thank you.

25         And before you leave, though, let me ask you about one

USA v HAYNES

1 other item.  During the course of the trial, the cooperation

2 agreement with the CI was referred to.  It was not admitted.

3 Perhaps it should be made part of the record, even though

4 it's not an exhibit that goes to the jury.

5   Are the parties satisfied to mark it as a Joint

6 Exhibit?

7     MR. SCHLES:  That would be fine with me, Your

8 Honor.

9     THE COURT:  It is simply in the record, but not to

10 go as evidence in the case.

11     MR. SCHLES:  That would be fine.

12     MS. COLEMAN:  Okay, Your Honor, yes.

13     THE COURT:  So it will be so marked, and admitted

14 for that limited purpose.

15     MS. COLEMAN:  Do you want one that is not marked?

16     THE CLERK:  Yes, do that.  We have one that is not

17 marked.  Here is 21.  And then you need 8.  She needs 8.

18 Not going to the jury as well.

19   (Pause.)

20     THE COURT:  Let me see counsel at the bench,

21 please.

22   (At Sidebar, AUSA Davis, AUSA Coleman, defense attorney

23 Schles and the defendant present.)

24   THE COURT:  As I understand it, the government is about

25 to rest.

1           Are you going to have any evidence?

2                    MR. SCHLES:  No, Your Honor.

3                    THE COURT:  My inclination is to excuse the jury

4      until tomorrow morning and recess to go over instructions to

5      get that set so that they don't have to wait around here for

6      an hour or hour and a half while we are trying to figure

7      them all out.  And so if that's agreeable with you and you,

8      when you rest, I'm going to excuse them until tomorrow

9      morning.

10                   MR. SCHLES:  That's fine.  Yes, Your Honor.

11                   MS. COLEMAN:  That's fine, Your Honor.

12                   THE COURT:  We'll proceed in that fashion, with

13     the understanding that you are not going to present any

14     evidence.

15                   MR. SCHLES:  You have my word, Your Honor.

16                   THE COURT:  That's good.

17         (End of sidebar.)

18         (Open Court.)

19                   MS. COLEMAN:  Your Honor, the United States has

20     confirmed that all the exhibits are admitted, and with that,

21     the United States rests.

22                   THE COURT:  And, ladies and gentlemen, as you've

23     heard, the United States has finished its testimony in the

24     case.  We still have a good ways to go in the case.

25         We are at a stage where the Court needs to take up a

1    matter with counsel that's going to take a fair amount of

2    time, and rather than have you wait here through that, I'm

3    going to ask you to plan to be back in the morning, at which

4    point we'll conclude the case.

5         And so, with that, keep in mind, just as you've been

6    told heretofore, that you are not to discuss the case with

7    anyone, not even among yourselves.  Don't let anyone draw

8    you into discussion about the case at home or elsewhere.

9    Avoid all social media having to do anything with this case,

10   as well as news media generally.  And we'll see you back in

11   the morning at 9:30.

12        Thank you, and good night.

13        (Jury out at 3:08 p.m.)

14             THE COURT:  Please be seated.

15        Is there a motion?

16             MR. SCHLES:  There is, Your Honor.

17        At this time, I would move for Motion for Judgment of

18   Acquittal as to both Count One and to Count Two.

19        Count One is the count alleging distribution on or

20   about June 18th, 2018.  We heard the testimony --

21             THE COURT:  Just a moment.

22        (Pause.)

23             MR. SCHLES:  -- relevant to that.

24             THE COURT:  Please go ahead.

25             MR. SCHLES:  We heard the testimony of Detective

USA v HAYNES

1 Aldridge, the testimony of Rocky Tucker, and we've reviewed

2 the video of the alleged controlled buy that involved my

3 client.  And there was the admission and 4 was the --

4 Exhibit 2, which was the methamphetamine that Rocky Tucker

5 returned to Detective Aldridge on June 18th, 2018.

6  Cumulatively, I do not believe that the evidence meets

7 the government's burden, even if you draw all the inferences

8 from it.  Mr. Tucker's testimony was erratic.

9  The video, while my client is identifiable in the

10 video, you do not see an exchange on the video.  There is no

11 video of an actual hand-to-hand delivery from my client.

12 There are other people present who were never even

13 identified with whom Mr. Tucker appears to be engaging in

14 conversation and discussing money and business.

15  So I don't think the government has met its burden with

16 respect to Count One.

17  Count Two, a conspiracy to distribute 50 or more grams

18 of a mixture containing methamphetamine between June 18th

19 and July 3rd, 2018.

20  Your Honor, there was methamphetamine seized from the

21 trailer on July 3rd, 2018.  The evidence appears to be clear

22 that my client had left and did not sleep there the night

23 before the raid; that my client had spent that night at the

24 Motel 6.  In fact, Mr. Shaffer had gone over there and taken

25 a shower and then gone to shoot pool and then met with the

1     source, C, just a couple of hours before the raid took

2     place.  And it is clear that the delivery of the

3     methamphetamine, at least the bulk of the methamphetamine

4     that was seized in that raid, on July 3rd, 2018, was

5     delivered to Mr. Shaffer, and there is no evidence that my

6     client had any agreement with Mr. Shaffer or with C

7     regarding that methamphetamine.

8          And in regards to amounts that Mr. Shaffer testified

9     that he, between, you know, early June and the date of his

10    arrest, received from C, all we have is his vague

11    recollection of it.  And he's fairly good about remembering

12    to say, "Me and my mom," "Me and my mom," every time, but

13    that's pretty much what we have for the sum total of

14    evidence going to a conspiracy.

15         And I do not believe that that is sufficient evidence

16    to meet the government's burden, and that no rational trier

17    of fact can convict based on the evidence that the

18    government has presented.

19              THE COURT:  Thank you.

20              MR. DAVIS:  Your Honor, the United States argues

21    that we have very clearly and very easily met our burden in

22    this case with respect to both Count One and Count Two of

23    the indictment.

24         Specifically, this Court and the jury heard evidence

25    from Detective Aldridge regarding Count One, the June 18th

1    controlled purchase -- the June 18, 2018, controlled

2    purchase that was made from the defendant.

3        Detective Aldridge testified about the measures that

4    the Metro Drug Unit took to ensure that, in fact, the

5    controlled buy was actually controlled from start to finish.

6    And, of course, the controlled purchase was audio and video

7    recorded as well.  The jury saw that recording; the Court

8    saw that recording.  It's pretty clear what happened in that

9    recording.

10       The controlled purchase plays out exactly -- or almost

11   exactly the way that Mr. Tucker described it in his own

12   testimony.  So you have mutually supporting testimony --

13   or -- excuse me -- Mr. Tucker's testimony is certainly

14   corroborated by that, by the audio and visual recording he

15   took of the controlled purchase.

16       Additionally, we do have, with respect to Count Two, we

17   have the testimony of Mr. Shaffer.  We don't need to rely

18   solely on his word; although, his memory and description of

19   events certainly is, I mean, coherent and comprehensive and

20   detailed.  He described in great detail the nature and the

21   scope of the conspiracy that he entered into with his mother

22   and with C -- or with the defendant and with his supplier,

23   who he knows as C.

24       He talked about where the money was kept, where they

25   kept the money they made selling methamphetamine in June and

1   July of last year.  He talked about the frequency and extent

2   of C's deliveries to him and to his mother.  And he talked

3   about how he would refer customers or potential customers to

4   the defendant when he was unavailable to buy

5   methamphetamine.

6        Those texts messages that we saw, I believe it was

7   Government Exhibits 15 through 18 -- or 15 and -- I don't

8   want to misspeak, Your Honor.  The series of text messages

9   between Mr. Shaffer and the woman named Sonjay, or Sonya, I

10  think is her actual name, shows that when Mr. Shaffer was

11  unavailable, he would refer clients or potential clients to

12  his mother.  That, of course, is very strong evidence of a

13  conspiracy between the defendant and Mr. Shaffer.

14       Finally, Your Honor, we do have the defendant's own

15  words in a statement that this Court previously found

16  admissible.  This defendant told Detective Aldridge that her

17  supplier of methamphetamine was named C or she knew her

18  supplier as C.  And she, too, made a statement about the

19  frequency of his deliveries and how much he delivered when

20  he delivered methamphetamine.  And her statement, as this

21  Court is well aware from this proceeding and from our

22  previous suppression hearing, the defendant's statement very

23  closely matches Mr. Shaffer's statement; they corroborate

24  one another.

25       For those reasons, Your Honor, the United States argues

USA v HAYNES

1    that we have met our burden, and that the Rule 29 Motion

2    should be denied.

3         Thank you.

4              THE COURT:  Mr. Schles, anything further?

5              MR. SCHLES:  No, Your Honor.

6              THE COURT:  The Court finds that there is ample

7    evidence to support both Counts One and Two, and accordingly

8    views it at this stage as a matter for jury determination,

9    and denies the motion.

10        I believe I understand from the earlier conference at

11   the bench that the defendant will rest at this point, as

12   well?  Is that correct?

13             MR. SCHLES:  That is correct, Your Honor.

14   Defendant rests.

15             THE COURT:  And we'll pick up tomorrow with the

16   jury with that announcement.

17        This evening -- it's now 3:15.  I want to see if, in

18   the next 45 minutes, the Court can get together the complete

19   set of instructions and have them available at 4 o'clock for

20   counsel to review.  And then I think it would probably be

21   well for us to plan to have you pick those up at 4 o'clock

22   and then return at 4:30 for an instruction conference.

23        Do the parties have anything further at this time?

24             MR. DAVIS:  No, Your Honor.

25             MS. COLEMAN:  No, Your Honor.

USA v HAYNES

1                    MR. SCHLES:  No, Your Honor.

2                    THE COURT:  We'll proceed accordingly.  Thank you.

3                    THE CLERK:  All rise.

4              (Proceedings concluded at 3:18 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2        I, Catherine Schutte-Stant, Federal Official Realtime

 3   Court Reporter, in and for the United States District Court

 4   for the Southern District of West Virginia, do hereby

 5   certify that, pursuant to Section 753, Title 28, United

 6   States Code, the foregoing is a true and correct Trial

 7   Excerpt of the stenographically reported proceedings held in

 8   the above-entitled matter and that the transcript page

 9   format is in conformance with the regulations of the

10   Judicial Conference of the United States.

11

12           s/Catherine Schutte-Stant, RDR, CRR

13           _____  May 9, 2019

14           Catherine Schutte-Stant, RDR, CRR
             Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```